## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 1:22-cr-00453-SEG-RGV |
| | :: | |
| MARCUS THOMAS | :: | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Marcus Thomas ("Thomas") is charged in a one-count criminal indictment with unlawful possession of a firearm and ammunition following a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  [Doc. 3].[1]  Thomas has filed two motions to dismiss, [Docs. 22 & 24], both of which the government opposes, [Docs. 29 & 34], and Thomas has filed replies in support of these motions, [Docs. 32, 36, & 83].[2]  Thomas also has filed a motion to suppress evidence obtained during a warrantless search, [Doc. 23], and a motion to suppress in-court and out-of-court identifications by a government witness, [Doc. 73], both of which the

---

[1] The indictment also contains a forfeiture provision pursuant to 18 U.S.C. § 924(d)(1), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p).  [Doc. 3 at 2-3].  The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Thomas also filed two notices of supplemental authority with respect to his pending motions to dismiss.  See [Docs. 37 & 79].

government opposes, [Docs. 34, 80, & 81], and Thomas has filed replies in support of these motions, [Docs. 35 & 83].  Following an evidentiary hearing on November 1, 2023,[3] on the motion to suppress evidence, as well as aspects of the motion to dismiss based on spoliation, the parties filed post-hearing briefs, see [Docs. 78, 80, 81, & 83].  For the reasons that follow, it is **RECOMMENDED** that Thomas' motions to dismiss, [Docs. 22 & 24], and his motions to suppress, [Docs. 23 & 73], be **DENIED**.

## I.  FACTUAL BACKGROUND

On July 1, 2022, Atlanta Police Department ("APD") officers, including Officer Jarvis Farley ("Officer Farley") and Sergeant Redmond Keeney ("Sergeant Keeney"), responded to a "shots fired" call at a Travel Inn motel located in Atlanta, Georgia.  (Tr. at 65-66, 71-73, 133, 135-36); see also [Docs. 71-10, 71-13, 71-15, 71-16, 71-17, & 71-18].  Special Agent Ashley Piorkowski ("Agent Piorkowski") of the Federal Bureau of Investigations ("FBI") also responded to the call after being informed of the shooting by one of the APD supervisors based on a possible

---

[3] See [Doc. 74] for a transcript of the evidentiary hearing held on November 1, 2023, which will be referred to as "(Tr. at __)" and cited according to the page number located in the top right corner of the transcript.  In addition, the parties submitted exhibits at the evidentiary hearing, see [Docs. 69 & 71], which will either be referred to as "(Gov't Ex. __)" for the government's exhibits and "(Def. Ex. __)" for Thomas' exhibits or by the document number.

unlawful firearm possession and an initiative "for federal and local police to address gun violence[.]"  (Tr. at 13-17, 153-54).

Officer Farley testified that when he arrived at the motel, he spoke to the clerk in the office, who informed him that the shooting occurred in room 356.  (Tr. at 72-73); see also [Doc. 71-15].  Prior to proceeding to the room, Officer Farley "spoke to [his] first witness," a housekeeper for the motel, "who told [him] that she had [] seen a male standing outside of his room with a weapon."  (Tr. at 74); see also (Tr. at 108-09, 138); [Docs. 71-6 & 71-15].  Officer Farley then spoke to "a second witness," who "described the same male, but [] added that . . . he saw that the weapon was silver in color with . . . a wood trim."  (Tr. at 74); see also (Tr. at 107).  Sergeant Keeney arrived while Officer Farley was still in the motel office, and the two officers "formulated a plan to go upstairs to see what [they] actually had, to see if [they] could get somebody to come to the door."  (Tr. at 74-75); see also (Tr. at 137, 141); [Docs. 71-10 & 71-15].[4]  The officers evacuated the area, "got people out of their rooms, . . . blocked off the street so that there was no moving

---

[4] Officer Farley also spoke to Britney Thomas on the phone while he was in the motel office, and she informed him that her brother, Thomas, was inside room 356. (Tr. at 73-74); see also [Doc. 71-15].  Officer Farley testified that it was their "hope [] that she could make contact with [Thomas] and have him come outside of the room" because when Officer Farley "called the room number from the office, no one answered."  (Tr. at 75).

traffic or pedestrian traffic," proceeded to the room, "and [] knocked [on] the door." (Tr. at 75-76, 138-39); see also [Doc. 69-7].

When Thomas opened the door to the motel room, officers handcuffed him and placed him in a chair. (Tr. at 81); see also [Doc. 71-10]. Officer Farley remained with Thomas as Sergeant Keeney and another officer, Officer Stevens, entered the room to perform a protective sweep, during which they saw a gun magazine in plain view in the bathroom and shell casings on the floor, which indicated to them that a gun had been discharged from inside of the room, consistent with the "two defects to the window that [officers saw outside the room and that] resembled a gunshot." (Tr. at 81-82, 93, 143, 145, 147-48); see also (Tr. at 142); [Docs. 71-10 & 71-16]. After Sergeant Keeney and Officer Stevens determined the room was clear, they continued searching the room by looking in the back of the toilet, dresser drawers, nightstand drawers, the microwave, inside and behind a mini fridge, behind the ironing board, under the bathroom sink, behind the chair, behind the dresser, inside the air conditioning unit, and behind the headboard of each bed, but they did not locate a firearm or seize any items observed in the room. See [Docs. 71-10 & 71-16]. Thomas was then taken down to a police vehicle, and Officer Farley again spoke with the two witnesses, who positively identified Thomas as the individual they saw earlier that day. (Tr. at 83-85); see also (Tr. at 98-99); [Doc. 71-16].

The officers decided to get a search warrant for the motel room.  (Tr. at 83, 91); see also [Doc. 71-4].  Sergeant Keeney conveyed information to Officer Farley about the items observed in plain view during the protective sweep of the room, but he did not mention that he and Officer Stevens had conducted a search of several areas in the room while looking for the firearm, and Officer Farley included the information from Sergeant Keeney in an affidavit he prepared to support a search warrant application.  See [Docs. 71-4 & 71-10]; (Tr. at 112, 148-49).  Officer Farley then went to the motel office to watch the surveillance video, which he testified "show[ed] a guy coming out of a room, a light-skinned guy with no shirt on and jeans."  (Tr. at 86).  Officer Farley testified that he watched the man walk "back and forth in and out of the room," and he "could see that he was holding something, but . . . [he] couldn't tell if it was a gun or not just because of the weather," since it was "raining that day" and the "camera footage was kind of foggy."  (Tr. at 86).  Officer Farley testified that the video showed the man walk "back into the room," followed by "two bursts of the glass outward."  (Id.).  Officer Farley further testified that "[b]ased off of the . . . witnesses and their descriptions and what . . . was seen on the . . . surveillance camera, there was no doubt that [they] had the right person."  (Tr. at 131).  Officer Farley completed drafting the search warrant affidavit, and the application for the warrant was submitted to a state court Magistrate Judge.  See [Doc. 71-4].

Agent Piorskowski testified that when she arrived at the motel, she saw bullet holes in the window of room 356, and she was informed "that they were waiting on the search warrant, that there was video available at the front desk, and that the subject was already taken from the scene." (Tr. at 19). Agent Piorskowski subsequently went to the motel office to watch the surveillance footage, (Tr. at 21), and she testified that she watched "a gentleman come in and out of [the] room on the second floor, and then he[] [was] kind of pacing back and forth kind of erratically," (Tr. at 22-23). Agent Piorskowski testified that the video then depicted the man "go into the room[ and] shut the door," and "then you could see when the two bullet holes appear in the video." (Tr. at 23). Agent Piorskowski subsequently left the motel to go to "where the defendant was being booked," and she testified that the appearance of the man in the surveillance footage was consistent with "the defendant's appearance that [she] saw in booking[,]" since he "wasn't wearing a shirt, . . . the brown cargo shorts that he was wearing [] [were] very similar," and he appeared with "[s]imilar skin color[] [and a ] similar build, skinny." (Tr. at 25-26). Agent Piorskowski testified that she had no "doubt that it was the same person[.]" (Tr. at 26).

A few hours after the initial sweep of the room, a search warrant was "approved[] and brought to the scene." (Tr. at 149); see also [Doc. 69-10]. APD officers then proceeded to search the room and collected the gun magazine, which

6

had two live rounds of ammunition, and shell casings that had been observed in plain view during the initial entry to the motel room, but a firearm was not located during the execution of the search warrant.  (Tr. at 28, 150-51); see also [Doc. 71-5 at 1; Doc. 71-12; Doc. 71-18].  After observing Thomas while he was being booked, Agent Piorskowski returned to the motel as the search warrant was being executed, and when she entered room 356, she saw "the magazine that was in plain view in the bathroom and a couple of the shell casings."  (Tr. at 27, 62).  The magazine, ammunition, and shell casings were collected by the APD, but the surveillance video was not.  (Tr. at 28); see also (Tr. at 47); [Doc. 71-5 at 1].  The firearm was subsequently located by a housekeeper on July 4, 2022, as she was cleaning room 356.  (Tr. at 31, 48, 151-52); see also [Doc. 71-6 at 1].⁵  APD officers subsequently retrieved the firearm from the motel.  (Tr. at 31, 152).

On December 20, 2022, a federal grand jury in the Northern District of Georgia returned an indictment against Thomas, charging him with one count of unlawful possession of a firearm and ammunition following a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  [Doc. 3].  Thomas has filed several pretrial motions, [Docs. 22, 23, 24, & 73], which are now fully briefed and ripe for ruling.

---

⁵ Agent Piorkowski testified that after the search of room 356 was completed on July 1, the owner of the motel "had th[e] room locked in case law enforcement wanted to come back, and then on the 4th is when he decided to take that lock off." (Tr. at 49-50); see also [Doc. 71-6 at 1].

## II.  DISCUSSION

**A.**   **Motions to Dismiss, [Docs. 22 & 24]**

Thomas has moved to dismiss the indictment, [Docs. 22 & 24], asserting that the statute he was indicted under, 18 U.S.C. § 922(g)(1), violates the Second Amendment, [Doc. 22].  Thomas also moves to dismiss the indictment based on spoliation of evidence, [Doc. 24], arguing that he is being deprived "of his constitutional right to prepare a defense" based on the missing motel surveillance video, [id. at 1].  In response, the government maintains that the indictment does not violate the Second Amendment and Thomas has not alleged facts to support a claim of spoliation of evidence.  [Docs. 29 & 34].  For the reasons that follow, the Court agrees with the government.

**1.**   *Second Amendment*

Thomas argues that the indictment must be dismissed because 18 U.S.C. § 922(g)(1) violates the Second Amendment.  See [Doc. 22].  He asserts that under the "Second Amendment test" established by the Supreme Court in New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022), the plain text of the Second Amendment covers his charged conduct, and "the government is unlikely to satisfy its burden of demonstrating that forever disarming 'felons' for possessing firearms is 'part of the historical tradition[.]'"   [Id. at 2 (citation omitted)]; see also [id. at 2-8].  Thomas also contends that the Supreme Court's

8

decision in Bruen "overruled or undermined [the Eleventh Circuit's ruling in United States v. Rozier, 598 F.3d 768 (11th Cir. 2010) (per curiam)] to the point of abrogation," and thus Rozier is not binding.  [Id. at 2; see also [id. at 8-15].  The government responds that the Eleventh Circuit's decision in Rozier "upholding the constitutionality of § 922(g)(1) remains undisturbed by [Bruen]," and "[i]n any event, the Supreme Court's decision in [Bruen] did not cast doubt on longstanding regulatory measures in this Nation that have consistently prohibited felons from possessing firearms."  [Doc. 29 at 1-2 (citations omitted)].

"The Second Amendment to the United States Constitution establishes the right to bear arms: 'A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.'" United States v. Williams, CRIMINAL ACTION NO. 1:21-cr-00362-LMM-LTW-1, 2022 WL 17852517, at *1 (N.D. Ga. Dec. 22, 2022) (quoting U.S. Const. amend. II). Although the Supreme Court in District of Columbia v. Heller, 554 U.S. 570 (2008), "held that the Second Amendment protects an individual's right to possess a firearm for traditionally lawful purposes," the Court also "explained that the Second Amendment right is not unlimited[.]"  United States v. Kirby, Case No. 3:22-cr-26-TJC-LLL, 2023 WL 1781685, at *1 (M.D. Fla. Feb. 6, 2023) (citing Heller, 554 U.S. at 624-27).  Because the Supreme Court stated in Heller that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the

9

possession of firearms by felons[,]" <u>Heller</u>, 554 U.S. at 626; <u>see also</u> <u>Rozier</u>, 598 F.3d

at 771, the Eleventh Circuit ruled in <u>Rozier</u> that "statutes disqualifying felons from

possessing a firearm under any and all circumstances do not offend the Second

Amendment," 598 F.3d at 771; <u>see also</u> <u>United States v. Hunter</u>, 645 F. Supp. 3d

1247, 1249 (N.D. Ala. Dec. 13, 2022) (citation omitted) (stating that the Eleventh

Circuit in <u>Rozier</u> "rejected a Second Amendment challenge to § 922(g)(1)").

To support his argument that § 922(g)(1) is unconstitutional "because it

violates the Second Amendment right to keep and bear arms," Thomas "relies

primarily upon the decision in [<u>Bruen</u>] . . ., which established a new two-step

method for evaluating the constitutionality of firearm regulations." <u>United States</u>

<u>v. Oliver</u>, Case No.: 2:22-CR-319-RDP-NAD, 2023 WL 7115572, at *1 (N.D. Ala. Oct.

27, 2023) (footnote and citation omitted). "However, binding Eleventh Circuit

precedent forecloses this argument," <u>id.</u>, since "[t]his Court remains bound by

<u>Rozier</u>," <u>Kirby</u>, 2023 WL 1781685, at *3 (citations omitted); <u>see also</u> <u>United States</u>

<u>v. Gilbert</u>, Criminal Action No. 21-00110-KD-N, 2023 WL 4708005, at *1 (S.D. Ala.

July 24, 2023) (citation omitted) (stating <u>Rozier</u> "remains binding precedent in this

circuit"), under the prior-precedent rule, which requires the Court to "follow a

binding Eleventh Circuit decision unless the Eleventh Circuit overrules it en banc

or it is overruled by the Supreme Court," <u>Williams</u>, 2022 WL 17852517, at *2 (citing

<u>United States v. Vega-Castillo</u>, 540 F.3d 1235, 1236 (11th Cir. 2008) (per curiam));

see also Oliver, 2023 WL 7115572, at *2; Hunter, 645 F. Supp. 3d at 1251.  "For an intervening decision of the Supreme Court to overrule a decision of an Eleventh Circuit panel, 'the Supreme Court decision must be clearly on point.'"  Williams, 2022 WL 17852517, at *2 (quoting Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003) (per curiam)); see also Oliver, 2023 WL 7115572, at *2 (citations omitted).  Here, "the Bruen decision is not 'clearly on point,'" since "[a]t issue in Bruen were the Second Amendment rights of 'law-abiding citizens,'" but it "is axiomatic that a felon is not a law-abiding citizen."  Williams, 2022 WL 17852517, at *2 (citation omitted).  Further, "the Eleventh Circuit did not rely on means-end scrutiny to reach its holding in [Rozier], nor did it apply the prohibited two-step analysis," and instead, the Rozier "panel relied on language in [Heller] limiting the Second Amendment right to 'law-abiding citizens.'"  Hunter, 645 F. Supp. 3d at 1251 (citations omitted).  Because the Rozier court "did not explicitly engage in interest-balancing, then it was not clearly overruled by [Bruen], and thus it remains binding on this [C]ourt."  Id. at 1252 (citation omitted).  Thomas "asks this [C]ourt to disregard [Heller's] assurance that 'longstanding prohibitions on the possession of firearms by felons' are 'presumptively lawful,' even though the Eleventh Circuit has given it 'considerable weight,' and the Supreme Court has cited it approvingly."  Id. at 1254 (citations omitted).  Thus, because Rozier "has not been clearly overruled or

undermined to the point of abrogation, this [C]ourt is bound by that decision's holding that § 922(g)(1) does not violate the Second Amendment."  Id. at 1249, 1254 (stating that "it is for the Eleventh Circuit to decide whether to depart from th[e] holding" in Rozier); see also Williams, 2022 WL 17852517, at *2 (citation omitted) ("As a district court bound to follow this circuit's controlling precedent, it is not for the Court to decide whether Bruen may ultimately be held to abrogate Rozier[.]").[6]   Accordingly, Thomas' arguments that the indictment should be dismissed because it violates the Second Amendment are foreclosed by Eleventh Circuit precedent and without merit, and his motion to dismiss, [Doc. 22], is due to be denied.[7]

---

[6] "Even if the Court was not bound by Rozier, the government offers evidence that § 922(g)(1) is part of the historical tradition of the Second Amendment," Kirby, 2023 WL 1781685, at *3 (citations omitted); see also [Doc. 29 at 13-14 (collecting cases)], and numerous "[o]ther courts have reached the same conclusion post-Bruen," Kirby, 2023 WL 1781685, at *3 (footnote and citations omitted).

[7] Thomas points to the fact that the Third Circuit vacated its decision in Range v. Attorney General United States, 53 F.4th 262 (3d Cir. 2022) (per curiam), upholding the constitutionality of § 922(g) to rehear the case en banc, see Range v. Att'y Gen. U.S., 56 F.4th 992 (3d Cir. 2023), in support of his argument that post-Bruen "court decisions on [§] 922(g) are not necessarily trending in the government's direction," [Doc. 22 at 7-8].  The Third Circuit has since issued an en banc opinion, ruling that the plaintiff, who pled guilty "to one count of making a false statement to obtain food stamps in violation of Pennsylvania law" in 1995 and completed three years of probation, though his conviction was classified as "a misdemeanor punishable by up to five years' imprisonment," remained "one of 'the people' protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun [was] protected by his right to keep and bear arms," and "[b]ecause the [g]overnment ha[d] not shown that our Republic has a longstanding history and

2.    *Spoliation*

Thomas also moves to dismiss the indictment based on spoliation of evidence.  [Doc. 24].  Specifically, he maintains that the lost motel surveillance video was potentially useful evidence and that the officers lost the video in bad faith.  [Id. at 19-28].  The government responds that the unpreserved video did not have exculpatory value that was apparent before it was destroyed, Thomas can obtain comparable evidence by other reasonably available means, and the government did not act in bad faith.  [Doc. 34 at 11-23].  For the reasons that follow, the Court agrees with the government.

"To establish a due process violation based on the loss or destruction of evidence, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed[ ] and be of such a nature that the defendant

---

tradition of depriving people like [the plaintiff] of their firearms, § 922(g)(1) [could not] constitutionally strip him of his Second Amendment rights."  Range v. Att'y Gen. U.S., 69 F.4th 96, 98, 106 (3d Cir. 2023), and a petition for a writ of certiorari is presently pending before the Supreme Court, No. 23-374 (U.S. Oct. 5, 2023).  The Third Circuit explained that its ruling was "a narrow one," premised on the plaintiff's challenge to the constitutionality of § 922(g)(1) "only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a)," a misdemeanor offense, Range, 69 F.4th at 106, so it is distinguishable from Thomas' case and his prior felony convictions, see [Doc. 3].  Moreover, the Third Circuit noted in its decision that the Eleventh Circuit reached a different conclusion about the constitutionality of § 922(g), albeit prior to the Supreme Court's ruling in Bruen, Range, 69 F.4th at 106, and for the reasons discussed, the Eleventh Circuit's ruling in Rozier remains binding, see United States v. Alvin, Case No. 22-20244-CR-GAYLES, 2024 WL 112108, at *2 (S.D. Fla. Jan. 10, 2024) (following Rozier and distinguishing Range based on the defendant's criminal history).

would be unable to obtain comparable evidence by other reasonably available means.'"  United States v. Gunn, No. 22-11858, 2023 WL 4195675, at *4 (11th Cir. June 27, 2023) (per curiam) (alteration in original) (quoting United States v. Revolorio-Ramo, 468 F.3d 771, 774 (11th Cir. 2006)); see also United States v. Addaquay, CRIMINAL CASE NO.: 1:20-CR-0045-LMM-JSA, 2022 WL 1514663, at *3 (N.D. Ga. Feb. 28, 2022) (citations omitted), adopted by 2022 WL 1284819, at *3 (N.D. Ga. Apr. 28, 2022); United States v. Roberts, CRIMINAL CASE NO. 1:17-cr-00183-MHC-RGV, 2017 WL 6892915, at *6 (N.D. Ga. Nov. 30, 2017) (citation omitted), adopted by 2018 WL 387795, at *1 (N.D. Ga. Jan. 11, 2018).  Further, "when the lost evidence was not clearly exculpatory but only 'potentially useful,' the defendant must show that law enforcement acted in bad faith."  Gunn, 2023 WL 4195675, at *4 (citing Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988)); see also United States v. Lanzon, 639 F.3d 1293, 1300 (11th Cir. 2011) (citation omitted); Addaquay, 2022 WL 1514663, at *3 (citing Illinois v. Fisher, 540 U.S. 544, 547-48 (2004)); Roberts, 2017 WL 6892915, at *6 (citation omitted).

The evidence at issue consists of a surveillance video from the Travel Inn motel at the time of the shooting that, although viewed by Agent Piorkowski and Officer Farley, was not retrieved from the motel prior to the time it was recorded over.  See (Tr. at 22, 24-26, 28-29, 41, 43, 47, 110, 113, 130).  However, Thomas "has not shown that the government's failure to preserve [this video] deprived him of

14

due process." Roberts, 2017 WL 6892915, at *6 (alteration and internal marks omitted) (quoting United States v. Gayle, 608 F. App'x 783, 790 (11th Cir. 2015) (per curiam) (unpublished)).  First, Thomas "has not established the materiality requirement, i.e., that the unpreserved evidence possessed an exculpatory value that was apparent prior to destruction, and that he is unable to obtain comparable evidence by other reasonably available means."  Id. (alterations, citation, and internal marks omitted).  Thomas contends that "[t]he lost surveillance video was 'potentially useful' to [ him], as it ha[d] the potential to make (or break) his case." [Doc. 24 at 19].  Specifically, Thomas asserts that viewing the surveillance video "'might' exonerate [ him] in many different ways," including that viewing the video "could determine whether the person allegedly depicted actually looks like [ him]"; "could determine whether others were involved"; and "would allow [ him] to test the credibility of Officer Farley, Sergeant Keeney, and Agent [Piorkowski]."  [Id. at 20-21].  However, Thomas has not presented any evidence that the video would exonerate him because he has not identified anything about the video that possessed exculpatory value as he offers only speculation of what it "might" depict.[8]

---

[8] Thomas contends the surveillance video is "partly exculpatory because it would have strongly undermined the accounts of Witness 1 . . . and Witness 2," since Officer Farley testified that "neither Witness 1 nor Witness 2 were in the video." [Doc. 78 at 4 (citations omitted)].  However, this is not exculpatory as "it would not have tended to establish [Thomas'] innocence," Brown v. Sec'y, Fla. Dep't of

Even if the Court assumes that the surveillance video meets the first requirement of the analysis, namely that the video "possess[ed] an exculpatory value that was apparent before [ it] was destroyed[,]" Gunn, 2023 WL 4195675, at *4 (citation and internal marks omitted), Thomas "can obtain comparable evidence by other reasonably available means," Roberts, 2017 WL 6892915, at *6 (alteration, citation, and internal marks omitted), since, as the government points out, see [Doc. 34 at 16], Agent Piorkowski and Officer Farley can "testify at trial regarding the content of the unpreserved [video] and [Thomas] will have ample opportunity to explore his chosen defense through cross examination," Roberts, 2017 WL 6892915, at *6 (citations and internal marks omitted); see also Revolorio-Ramo, 468 F.3d at 774-75 (citation omitted) (finding "the record demonstrate[d] that the defendants had the opportunity to cross-examine the law enforcement officers who viewed the contents of the [boat ] to 'attempt to raise doubts in the mind of the factfinder,'" and "[t]his opportunity, coupled with the testimony of the [defendants], and the evidence of commercial fishing equipment successfully documented, constitute[d] comparable evidence"); United States v. Foster, Case

---

Corr., Case No. 3:20-cv-1188-TJC-JBT, 2024 WL 309970, at *5 (M.D. Fla. Jan. 26, 2024), and at best, it would only be a basis for challenging the testimony of the witnesses, see Keeler v. Jones, CASE NO. 15-60333-Civ-LENARD, 2016 WL 11688066, at *15 (S.D. Fla. Jan. 12, 2016) (citations omitted) (stating that "any undisclosed evidence regarding the deposition transcript is not exculpatory and would essentially consist of, at best, impeaching evidence"), adopted by 2018 WL 10798972, at *7 (S.D. Fla. Mar. 15, 2018).

No.: 4:20-cr-29-CLM-JHE, 2023 WL 3059153, at *3 (N.D. Ala. Apr. 24, 2023) (stating that "the loss of the photos [did not] prevent [defendant] from arguing at trial that the jury should disbelieve the arresting officers[,]" defendant could "cross-examine the officers about the arrest and whether they used excessive force," and defendant could "also testify himself about what he alleges happened the night of the arrest"); United States v. Hameen, Case No. 3:18-cr-115-J-34JBT, 2018 WL 6580996, at *8 (M.D. Fla. Dec. 13, 2018) (citations omitted) (finding the defendant was able to obtain comparable evidence "through the cross examination of the government's witnesses and the introduction of his own testimony or that of other witnesses" where the government failed to retrieve and preserve the hotel surveillance video of defendant's arrest).

In any event, Thomas "has failed to show bad faith on the part of the [g]overnment." Addaquay, 2022 WL 1514663, at *3. Thomas contends that he has "made a sufficient showing of bad faith through circumstantial evidence, at least sufficient enough to entitle him to an evidentiary hearing on the issue." [Doc. 24 at 23]. Specifically, Thomas points to various pieces of "evidence" that allegedly amount to bad faith from the time that he was placed in handcuffs to the execution of the search warrant, including Sergeant Keeney interrogating him before he was read his Miranda[9] rights, officers searching the motel room without a warrant "'to

---

[9] See Miranda v Arizona, 384 U.S. 436 (1966).

check for any victims,'" Sergeant Kenney making gestures and facial expressions to other officers, Sergeant Kenney not informing other officers that a firearm was not located during the initial search, and Officer Farley failing to follow up with witnesses to confirm Thomas' identity as the shooter.  See [id. at 9-17, 23-28 & n.3 (citations omitted)].  However, as the government points out, "none of the asserted facts suggest that investigators were aware of anything exculpatory in the surveillance video at the time it was not collected," and Thomas' various allegations "have nothing to do with the issue of bad faith as it relates to the surveillance video."  [Doc. 34 at 19-20].

The only argument Thomas seems to make to support his claim of bad faith related to the surveillance video itself is his assertion that APD "procedures appear to require that relevant video footage be collected and safely stored, [y]et the surveillance video that [officers] claim they viewed is now lost," and "[t]his failure, combined with the rest of the circumstantial evidence, points to bad faith."  [Doc. 24 at 25-26 (citation omitted)].  However, a "showing of bad faith requires the government's conduct to reach the level of an 'intentional bad faith act,'" United States v. Londono, CASE NO. 10-20763-1-CR-LENARD(GRAHAM)/GOOD MAN, 2018 WL 706761, at *4 (S.D. Fla. Jan. 10, 2018) (footnote omitted) (quoting Revolorio-Ramo, 468 F.3d at 775), adopted by 2018 WL 705313, at *1 (S.D. Fla. Feb. 2, 2018), and "[m]ere negligence on the government's part in failing to preserve

evidence is inadequate to show bad faith," Gordon v. Sec'y, Dept. of Corr., Case No: 2:14-cv-549-FtM-29CM, 2016 WL 1436600, at *5 (M.D. Fla. Apr. 12, 2016) (citing Youngblood, 488 U.S. at 58); see also Londono, 2018 WL 706761, at *4 (citations omitted) (stating that "[a] showing of negligence, even gross negligence, is insufficient to establish bad faith").

Here, "[t]here is simply no evidence to suggest that any [APD officer or FBI agent] contemplated the evidentiary significance of the . . . [surveillance] footage that [Thomas] desires, and deliberately failed to obtain it for purposes of denying that evidence to [Thomas]," Addaquay, 2022 WL 1514663, at *4; see also United States v. White, 660 F. App'x 779, 784 (11th Cir. 2016) (per curiam) (unpublished) (finding that, even assuming that the emails in question "were altered or omitted, [the defendant] did not point to any evidence that the government did so deliberately, much less that the government deleted or altered emails in bad faith"); Revolorio-Ramo, 468 F.3d at 775 (stating that "[t]he fact that [] instructions were carried out very poorly does not rise to the standard of an intentional bad faith act"). First, "[t]here is no dispute that the [g]overnment had no involvement with the . . . destruction of the footage," Addaquay, 2022 WL 1514663, at *3, because by the time Agent Piorkowski "found out that the surveillance footage had not been collected" and Officer Farley "found [out] that [] the surveillance [video recorded through his body camera] had not been saved," "it was well

outside of the time [the motel] would keep their video," since "surveillance video footage gets recorded over all the time," (Tr. at 28, 87, 117), and Agent Piorkowski testified that in her experience, it was "pretty standard that [surveillance footage] is only retained for a certain period" by motels, (Tr. at 28-29).   Additionally, "[t]here is no indication that the [g]overnment either knew the video was potentially exculpatory and let it be destroyed, or purposefully caused its destruction," Addaquay, 2022 WL 1514663, at *3, since Agent Piorkowski thought it was inculpatory in that she "did [not] have any doubt" that Thomas was the person in the video,[10] see (Tr. at 26); see also Reese v. Jones, Case No.: 5:16cv10/WTH/EMT, 2018 WL 6517781, at *7, *43 (N.D. Fla. June 19, 2018) (finding the defendant alleged "no facts which suggest[ed] [the investigator] believed that the [destroyed] diagram/map exonerated [defendant]"), adopted by 2018 WL 6516028, at *1 (N.D. Fla. Dec. 10, 2018), and Officer Farley thought his body camera was recording when he watched the surveillance footage, which was how police officers "typically obtain[ed] surveillance footage," but he learned later on that it

---

[10] Although Thomas seems to imply that Agent Piorkowski watched the surveillance video prior to making a comment to Sergeant Kenney "appearing to agree that rain would make it hard for video to make out the identity of the person," and then subsequently "suggest[ed] that [the] surveillance video had positively identified [] Thomas," [Doc. 24 at 16 (citations omitted)], it is clear from Sergeant Keeney's body camera footage that Agent Piorkowski made this comment when she first arrived on the scene, prior to watching the surveillance video, see [Doc. 71-11].

did not record because the battery died, see (Tr. at 81, 85-90, 120, 125);[11] see also

Gayle, 608 F. App'x at 790 (footnote omitted) (finding the "district court properly

found no bad faith" where "[t]he detective who interviewed [d]efendant testified

that he tried to record the interview, but the recording device malfunctioned");

United States v. McCray, Case No. 2:05-cr-531-KOB-TMP, 2008 WL 11462918, at *4

(N.D. Ala. Sept. 15, 2008) (stating "[e]rrors, as opposed to intent to harm, cannot

form the basis for abating a criminal prosecution").

---

[11] Thomas' argument that Officer Farley "in bad faith[] intentionally failed to preserve the surveillance video" since he knew that his body camera was off before he watched the surveillance video, [Doc. 78 at 1-2], is premised on the presumption that Officer Farley recalled that his body camera battery had died at the time he viewed the surveillance video and then deliberately falsified reports about it, but there is no factual basis for this contention and it ignores Officer Farley's testimony that "a lot happened that day" and "it was a very intense scene," and when he was preparing the report, he believed at that time that his body camera had captured the surveillance video and "thought that all bases had been covered," which was simply a "mental lapse," (Tr. at 124-25), and does not demonstrate that Officer Farley intentionally failed to preserve the surveillance video. Indeed, the Court finds that very testimony at the suppression hearing that Thomas cites as evidence of bad faith instead supports the conclusion that Officer Farley failed to pay attention to the timing of the battery expiring on his body camera, not that he was engaged in a deliberate attempt to deprive Thomas of evidence from the surveillance video. Similarly, Thomas contends that the fact that Officer Farley did not collect the surveillance video despite his awareness that his body camera had died "likely means that the video contained some exculpatory value and would have been inconvenient for his investigation." [Doc. 83 at 7]. However, this argument is speculative and ignores the testimony of Agent Piorkowski, to whom Officer Farley's conduct is not attributable, that she thought the video was inculpatory in that she "did [not] have any doubt" that Thomas was the person in the video. (Tr. at 26).

"At worst, the failure to retrieve the video could be described as negligent, and mere negligence in failing to preserve evidence is inadequate to show bad faith." Hameen, 2018 WL 6580996, at *8 (citation omitted); see also Addaquay, 2022 WL 1514663, at *4 (stating "even assuming that it might have been better police work to have [requested more hours of video footage], [the defendant] cannot justify suppression of evidence based on such arguable negligence"); Roberts, 2017 WL 6892915, at *7 (citations and internal marks omitted) (finding that "the actions of the government, as alleged by [defendant], [could] at worst be described as negligent" where the defendant alleged that the government was aware that the software would delete messages at a certain point but did not act timely to transfer the messages to a more permanent storage); McCray, 2008 WL 11462918, at *3 (stating that "[a]t worst, defendant [could] show only that [the officer] and the United States Attorney's [o]fficer negligently failed to keep each other informed about the case and evidence material to it"). Thus, "there is no evidence of bad faith by the government or any of its agents which resulted in the failure to retrieve and preserve the surveillance video." Hameen, 2018 WL 6580996, at *8; see also Gayle, 608 F. App'x at 790 (stating that "[i]n short, there [was] no evidence that the police purposely destroyed the recording of [d]efendant's interview"). Accordingly, it is **RECOMMENDED** that the motion to dismiss based on spoliation of evidence, [Doc. 24], be **DENIED**.

**B.**   **Motions to Suppress Evidence and Identifications, [Docs. 23 & 73]**

Thomas moves to suppress evidence obtained during a warrantless search of the motel room, [Doc. 23], and the in-court and out-of-court identifications made by any government witnesses, [Doc. 73].  In particular, Thomas contends that his Fourth Amendment rights were violated when law enforcement officers search his motel room without a warrant and subsequently seized a gun magazine, two spent shell casings, and several rounds of ammunition, and he moves to suppress this evidence, as well as observations made by the officers during the "illegal search," all "fruits of the illegal search and seizure," including the firearm charged in the indictment, and any statements made by Thomas "during the illegal search[] and subsequent to his resulting arrest."  [Doc. 23 at 1-2].  Thomas also seeks to "suppress any in-court identifications based on suggestive out-of-court identifications by any government witness, as well as any testimony concerning the out-of-court identifications themselves."  [Doc. 73 at 1].  Specifically, Thomas takes issue with the "'show up' at the Travel Inn on July 1, 2022, wherein 'Witness 1' identified [] Thomas as a shooter."  [Id.].  In response, the government argues that Thomas' "suppression allegations necessarily fail because (1) [he] has failed to show that he has standing to challenge the evidence collected in his hotel room, (2) all evidence collected in the hotel room was obtained via a valid search warrant, and (3) [he] did not make statements to [APD] officers during a 'custodial

interrogation.'"  [Doc. 34 at 2 (footnote omitted)].  Additionally, the government asserts that "the show-up was not unduly suggestive and even if it was, the witness' identification of [Thomas] as the man with the gun was reliable under the totality of the circumstances."  [Doc. 80 at 3; Doc. 81 at 3].  Thomas has filed replies in support of the motions to suppress, [Docs. 35 & 83], and the Court will address each motion in turn.

1. *Motion to Suppress Evidence Obtained During Search, [Doc. 23]*

Thomas contends that the evidence collected from the motel room should be suppressed because the search warrant was tainted by a presumptively illegal search.  [Doc. 30 at 6-10]; see also [Doc. 23 at 1, 3-4].  Additionally, Thomas asserts that he has standing to challenge the evidence collected from the motel room, since he had a legitimate expectation of privacy in the room even though it was booked by his sister.  [Doc. 30 at 1-6].  In response, the government contends that Thomas lacks standing and all evidence collected in the hotel room was obtained via a valid search warrant.  [Doc. 34 at 24-35].  In his reply brief, Thomas argues that he "has Fourth Amendment standing under [Byrd v. United States, 584 U.S. 395 (2018)], a case the government ignores," and that he "is entitled to a hearing to determine whether the government's warrantless search, upon which the search warrant was based, can be justified."  [Doc. 35 at 1-7 (emphasis omitted)]; see also [id. at 7-13].

24

The Fourth Amendment of the United States Constitution "safeguards the rights of the people to be free from unreasonable searches and seizures." United States v. Yarbrough, 961 F.3d 1157, 1163 (11th Cir. 2020) (citing U.S. Const. amend. IV). This protection "extend[s] to any thing or place with respect to which a person has a reasonable expectation of privacy, including a hotel room."[12] United States v. Ross, 964 F.3d 1034, 1040 (11th Cir. 2020) (internal marks omitted) (citing California v. Ciraolo, 476 U.S. 207, 211 (1986); Stoner v. California, 376 U.S. 483, 490 (1964)); see also United States v. Mastin, 972 F.3d 1230, 1236 (11th Cir. 2020). "In most circumstances, unless there is consent, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment." United States v. Dumas, No. 21-11341, 2023 WL 3302878, at *4 (11th Cir. May 8, 2023) (per curiam) (citation omitted); see also Yarbrough, 961 F.3d at 1163 (citation omitted) ("A search conducted in the absence of a search warrant is, usually, presumptively unreasonable."). However, there are several exceptions to the warrant requirement. Moore v. Sheriff of Seminole Cnty., 748 F. App'x 229, 232 (11th Cir. 2018) (per curiam) (unpublished) (citation omitted). One exception "is the 'protective sweep,' which is 'a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or

---

[12] The government acknowledged at the evidentiary hearing that Thomas adequately demonstrated he had a reasonable expectation of privacy as a guest in the motel room rented by his sister. See (Tr. at 11).

others.'"  Yarbrough, 961 F.3d at 1163 (quoting Maryland v. Buie, 494 U.S. 325, 327

(1990)).[13]   Another exception to the warrant requirement is "when 'exigent

circumstances' create a 'compelling need for official action and there is no time to

secure a warrant.'"  Moore, 748 F. App'x at 232 (alteration and citation omitted);

see also Rivera, 824 F. App'x at 933 (citations and internal marks omitted) ("While

warrantless searches and seizures within a home are presumptively unreasonable,

an exception to the warrant requirement permits police to enter a private premises

and conduct a search if exigent circumstances mandate immediate action.").  "The

most urgent of these exigencies is 'the need to protect or preserve life' in an

emergency situation," also "known as the 'emergency aid' exception."  United

States v. Timmann, 741 F.3d 1170, 1178 (11th Cir. 2013) (citing Kentucky v. King,

563 U.S. 452, 460 (2011); United States v. Holloway, 290 F.3d 1331, 1335 (11th Cir.

2002)).[14]  The government bears the burden of proving an exception to the warrant

requirement.  See Michigan v. Tyler, 436 U.S. 499, 509 (1978).

---

[13] "The sweep must be 'narrowly confined to a cursory visual inspection of those
places in which a person might be hiding.'"  Yarbrough, 961 F.3d at 1163 (quoting
Buie, 494 U.S. at 327).  "Police can seize evidence discovered in plain view during
a protective sweep and use it to obtain a search warrant."  United States v. Rivera,
824 F. App'x 930, 933 (11th Cir. 2020) (per curiam) (unpublished) (citing United
States v. Williams, 871 F.3d 1197, 1202 (11th Cir. 2017) (per curiam)).

[14] "Our precedents do not require police to know the unknowable on pain of
suppression," meaning "officers do not need ironclad proof of a likely serious, life-
threatening injury to invoke the emergency aid exception," but "[i]nstead, [courts]
look to the entirety of the circumstances to see whether a reasonable officer,

In this case, APD officers arrived at the Travel Inn motel on July 1, 2022, in response to a call that shots had been fired from room 356.  (Tr. at 14-15, 17, 71-72, 135-36, 153); see also [Doc. 71-4 at 1].  When Officer Farley arrived at the motel, he spoke to Thomas' sister, who informed him that her brother was inside the room, (Tr. at 73-74), and interviewed two witnesses, who described the same male standing outside of room 356 with a weapon, (Tr. at 74); see also (Tr. at 107-09, 138); [Doc. 71-6].  APD officers went to room 356, where they noticed "two defects to the window that . . . resembled a gunshot[.]"  (Tr. at 82); see also (Tr. at 142).  After Sergeant Keeney and Officer Farley knocked on the door and detained Thomas, Sergeant Keeney and Officer Stevens performed a protective sweep of the room "to see if there [were] any injured parties inside," and saw a gun magazine in plain view in the bathroom and shell casings on the floor.  (Tr. at 81-82, 93, 143, 145, 147-48); see also [Docs. 71-10 & 71-16].[15]  The officers did not remove any items from the room, and Officer Farley subsequently signed an

---

confronted with those circumstances, could have objectively believed that an immediate search was necessary to safeguard potential victims."  United States v. Evans, 958 F.3d 1102, 1105-06 (11th Cir. 2020) (citations and internal marks omitted).

[15] As previously noted, Sergeant Keeney and Officer Stevens also searched other areas of the room after completing the protective sweep and observing the gun magazine and shell casings, [Docs. 71-10 & 71-16], and Thomas' arguments about their conduct after the protective sweep will be addressed hereinafter.

affidavit and application for a search warrant in which he listed the facts "tending

to establish probable cause" as:

> At the Travel Inn Motel, . . . room #356, [Officer Farley] was called out
> to the location via 911 in regards to shots fired from a room. The shots
> were said to have been fired from room 356. Witness 1, the
> housekeeper, stated she [saw] a black male holding a weapon in his
> hand after exiting room 356 and advised hearing a gunshot being
> fired from the room. Witness 2 stated he [saw] a black male exiting
> room 356 holding a firearm handgun in his hands. Witness 2 stated
> he went back inside of room 354, and immediately heard a gunshot
> fired from the neighboring room.
>
> As officers approached room 356, two defects to the window of room
> 356 [were] seen. The room has only two windows which are
> positioned adjacent to the door.
>
> After officers arrived on scene and knocked at door 356, [t]he male
> identified by witnesses open[ed] the door, complied with all verbal
> commands and was detained without incident.
>
> The accused opened the door upon a knock from police. The accused
> was detained. In the process of clearing the room to make sure no
> victim was found inside, a long firearm magazine with two[] live
> rounds were found in the bathroom on the floor in [plain] view. The
> magazine was silver in color. After searching the accused incident to
> arrest no weapon was located on his person. It is a reasonable
> suspicion to believe the firearm is inside the room.

[Doc. 71-4 at 1 (emphasis omitted)].

Based on the totality of the facts known to the officers at the time of entry

into room 356, it is clear that exigent circumstances justified the warrantless entry

and protective sweep of the motel room. See United States v. Huffman, 461 F.3d

777, 785 (6th Cir. 2006) (finding warrantless entry into residence was justified

28

where officers received a 911 call reporting shots fired from the residence, which was confirmed by neighbors, and they "observed bullet holes in the exterior and interior walls of the house" and "unswept shards of glass on the front porch of the residence," which led them to believe "that the shots had been recently fired," even though the incident had taken place at least eight hours before they arrived); see also (Tr. at 143 (Sergeant Keeney's testimony that "the call for service in and of itself was there were shots fired, and [they had] . . . a window being shot out, so we assumed possibly that there might be somebody else inside the room with [Thomas], somebody that might be gravely injured")); United States v. Gambino-Zavala, 539 F.3d 1221, 1226 (10th Cir. 2008) (citing Holloway, 290 F.3d at 1338) ("holding anonymous 911 call about ongoing gunshots and arguing at certain house justified warrantless search of residence"); United States v. Taylor, 458 F.3d 1201, 1205 n.1 (11th Cir. 2006) (finding exigent circumstances justified the officers' entry onto defendant's property where they were "responding to a 911 hangup call and two more hang-ups, trying to determine if there was an emergency that prevented the caller from answering the call-backs" and they "merely entered the property and knocked on the front door"); United States v. Holstick, CASE NO. 3:17-cr-223-WKW, 2018 WL 2676704, at *4 (M.D. Ala. Apr. 17, 2018) (finding it "was objectively reasonable for the officers to enter the trailer to search for potential victims" where they responded to a 911 call reporting a drive-by

shooting, witnesses pointed to the trailer as the scene of the shooting, and officers could see bullet holes in the side of the trailer), adopted in part by 2018 WL 2560331, at *8 (M.D. Ala. June 4, 2018), aff'd, 810 F. App'x 732 (11th Cir. 2020) (per curiam) (unpublished); United States v. Jones, CASE NO. 17-CR-20696-WILLIAMS/TORRES, 2018 WL 11193325, at *4 (S.D. Fla. Feb. 15, 2018) (citation omitted) (finding that "[u]nder the circumstances, it was reasonable for the officers to believe they had encountered an emergency situation that allowed for warrantless entry into the apartment" where they received a 911 reporting that a gun had been discharged at the scene, officers heard loud noises from within the apartment, and "[a]nother person present at the apartment complex [] told the officers that [d]efendant possessed a firearm").  Thus, "[o]n the present record, the Court concludes that the initial entry of [r]oom [356] by [Sergeant Keeney and Officer Keeney] was not unreasonable under the Fourth Amendment."  United States v. Cutbank, Case No. 21-cr-268 (SRN/LIB), 2022 WL 4112596, at *27 (D. Minn. June 21, 2022) (citations omitted), adopted by 2022 WL 3572955, at *12 (D. Minn. Aug. 19, 2022).

Moreover, since "[p]olice can seize evidence discovered in plain view during a protective sweep and use it to obtain a search warrant," Rivera, 824 F. App'x at 933 (citing Williams, 871 F.3d at 1202), "[a]ny evidence [observed] during the sweep was properly used to secure a search warrant for the [motel room],"

United States v. Magluta, 44 F.3d 1530, 1538 (11th Cir. 1995) (citation omitted).

While performing a protective sweep of the room, APD officers saw a gun magazine in plain view in the bathroom and shell casings on the floor, (Tr. at 81-82, 93, 143, 145, 147-48), and although the officers were authorized to seize this evidence without a warrant based on the fact that they were in plain view during the protective sweep, see Rivera, 824 F. App'x at 933 (citation omitted),[16] the gun magazine and shell casings were not actually seized until after the search warrant was executed, see (Tr. at 27, 62).  And, because Sergeant Keeney "was lawfully in [r]oom 356 when he observed in plain view [a gun magazine and shell casings] on the [floor of the motel room], . . . . it was appropriate to include Sergeant [Keeney's] 'plain view' observations in the affidavit submitted in support of the application for the [motel room] [s]earch [w]arrant."   Cutbank, 2022 WL 4112596, at *27.

---

[16] Because they were subject to seizure when they were observed in plain view during the protective search, there is no basis for suppression of the gun magazine and shell casings.  See United States v. Seese, CRIMINAL INDICTMENT NO.: 2:17-CR-00037-RWS-JCF, 2018 WL 7142025, at *9 (N.D. Ga. Oct. 26, 2018) (citation and internal marks omitted) (denying motion to suppress evidence and finding seizure of a "rifle was reasonable and did not violate the Fourth Amendment" where "[t]he gun was in plain view and therefore its discovery and seizure did not violate the Fourth Amendment" since warrantless seizures are permissible under the plain view doctrine "where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent"), adopted by 2019 WL 369143, at *1 (N.D. Ga. Jan. 30, 2019); see also United States v. Hollis, 780 F.3d 1064, 1069 (11th Cir. 2015) ("Because the officers could conduct a protective sweep, the evidence they found in plain view was admissible.").

31

Additionally, "[c]onsidering the affidavit submitted in support of the [motel room] [s]earch [w]arrant application which warrant ultimately authorized law enforcement to search [r]oom [356], [the judge who authorized the warrant] could reasonably have concluded that there was a fair probability that evidence of the [weapon, described as a "firearm handgun,"] would be found in [r]oom [356]." Id., at *28; see also [Doc. 69-10 at 1].[17]

To the extent Thomas argues that suppression of the evidence is warranted based on the search that Sergeant Keeney and Officer Stevens conducted that exceeded the proper scope of a protective sweep, namely that the APD officers also searched locations including the drawers, microwave, mini-fridge, toilet, and air conditioning unit, which was not "'narrowly confined to a cursory visual

---

[17] Regardless, "[t]he search warrant application, absent any information obtained as a result of the protective sweep, sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Ackerman, No. 21-CR-2023 CJW-MAR, 2022 WL 3011136, at *9 (N.D. Iowa July 29, 2022) (citation and internal marks omitted), aff'd, 87 F.4th 925 (8th Cir. 2023). Specifically, the warrant application detailed a 911 call that shots were fired from room 356, that two witnesses saw a male exiting room 356 wielding a firearm, and that the window to room 356 had two bullet hole defects. [Doc. 71-4 at 1]. Thus, even without the information obtained as a result of the protective sweep, "the search warrant application contained plenty of untainted evidence to establish probable cause." United States v. Beck, No. 21-13582, 2023 WL 5016614, at *4 (11th Cir. Aug. 7, 2023); see also United States v. Albury, 782 F.3d 1285, 1292 (11th Cir. 2015) (finding that "independent of any unlawful search of [the] room[, the] [d]etective['s] [] affidavit contained sufficient evidence to support a finding of probable cause").

inspection of those places in which a person might be hiding,'"[18] Yarbrough, 961 F.3d at 1163 (quoting Buie, 494 U.S. at 327), Thomas specifically recognized in his motion to dismiss that "these searches yielded nothing," [Doc. 24 at 13 n.4]. Consequently, "[n]o evidence located as a result of unconstitutional overreaching formed the basis of the agents' search warrant application or the actual warrant eventually issued." United States v. Cole, Criminal Case No. 1:09–CR–0412–ODE–RGV, 2010 WL 3210963, at *22 (N.D. Ga. Aug. 11, 2010). "As a result, no evidence stands to be suppressed due to any acts by the agents that arguably went beyond the protective sweep permitted by [Buie]." Id. (citation omitted).[19]

Thomas also contends that he is entitled to a hearing under Franks v. Delaware, 438 U.S. 154 (1978), since information regarding Sergeant Keeney's

───────────

[18] Although the government has not established any lawful basis for the search conducted by Sergeant Keeney and Officer Stevens after the protective sweep was completed, and their conduct is not sanctioned in any way by this ruling, it does not impact the admissibility of the evidence for the reasons discussed. See United States v. Griss, Criminal Case No. 2:20-cr-01223, 2021 WL 4170132, at *7-8 (S.D. Tex. Sept. 13, 2021) (finding that "[t]he search of the metal case in the utility shed exceeded the scope of a protective sweep, however, there was no evidence discovered as a result," and thus, "while that search was illegal, it d[id] not taint the lawful search that was occurring inside the house," and further, that the deputy's "re-entry into the house and search of the backpack does not retroactively taint the evidence he discovered that had already been seen in plain view").

[19] Furthermore, Thomas' argument that the firearm should be suppressed as a fruit of the unlawful search is without merit because the firearm was not seized pursuant to the search warrant but was located a few days later by the housekeeper as she cleaned room 356.

search of the room after the initial protective sweep was omitted from the search warrant application.  [Doc. 35 at 10-13]; see also [Doc. 78 at 2, 15-19; Doc. 83 at 10-16].   In Franks, the Supreme Court held that where "(i) a defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit or made the false statement with reckless disregard of its truth, and (ii) the false statement was necessary to the finding of probable cause, then a hearing on the affidavit must be held at the defendant's request."  United States v. Terzado, Case No. 21-CR-60143-SMITH/VALLE, 2022 WL 4794874, at *2 (S.D. Fla. Aug. 2, 2022) (citing Franks, 438 U.S. at 155-56), adopted by 2022 WL 4764108, at *1 (S.D. Fla. Oct. 3, 2022).  This standard "also applies to material omissions of fact," and "[b]oth prongs must be satisfied to warrant a hearing."  Id. (citations omitted) (citing Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997)); see also United States v. Kirton, CRIMINAL CASE NO. 1:19-CR-00022-WMR-JFK, 2019 WL 6868978, at *6 (N.D. Ga. Oct. 18, 2019) (stating Franks "is applicable to information omitted from an affidavit for a search warrant"), adopted by 2019 WL 6840132, at *1 (N.D. Ga. Dec. 16, 2019).  Further, "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine"; "[t]here must be allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  Franks,

438 U.S. at 171.  "No <u>Franks</u> hearing is required, if, when the omitted information is added to the affidavit, the affidavit's content still establishes probable cause for the search."  <u>Kirton</u>, 2019 WL 6868978, at *6 (citation omitted).

Thomas is not entitled to a <u>Franks</u> hearing because he "has not made a substantial preliminary showing . . . that material information was intentionally and/or recklessly omitted from the affidavit or, alternatively, made a showing that such alleged . . . omissions undermined the probable cause otherwise set forth in the affidavit as necessary for a <u>Franks</u> hearing to be held."  <u>Id.</u>, at *7; <u>see also</u> <u>Terzado</u>, 2022 WL 4794874, at *3 (citation omitted) (finding defendant had "not provided any offer of proof, affidavit or other sworn statement to support his allegation that the affiant intentionally or recklessly misrepresented" information in the affidavit).  "None of the claimed omitted information on its face is so clearly critical to the probable cause determination that its omission created a presumption of recklessness," and even if the information regarding the places Sergeant Keeney and Officer Stevens searched after the protective sweep "had been included, the warrant affidavit would still have supported the probable cause determination," <u>United States v. Bivins</u>, 560 F. App'x 899, 906 (11th Cir. 2014) (per curiam) (unpublished), since the gun magazine and shell casings were observed in plain view during the protective sweep, and even with the addition of the places searched by Sergeant Keeney and Officer Stevens, a firearm was not located

during their cursory search after the protective sweep, and the totality of the facts presented in the affidavit supplied probable cause that a firearm may yet be found in the motel room, upon a more thorough search of the room, see United States v. Boyce, CRIMINAL ACTION NO. 1:20-CR-217-JPB-CCB, 2021 WL 9217153, at *5 (N.D. Ga. Nov. 10, 2021) (finding that "[t]he information in the affidavit about the drugs, pills, and gun observed in plain view . . . provides ample probable cause to support the warrant, even without considering the canine alert"), adopted by 2022 WL 2438410, at *3 (N.D. Ga. July 5, 2022); see also United States v. Broadbent, No. 2:19-CR-00155-DJC, 2023 WL 7117490, at *4 (E.D. Cal. Oct. 26, 2023) (finding that the evidence "would have supported probable cause to search her home even with the inclusion of the omitted information" where, "[w]hile the omitted information might have cast some doubt on whether there were drugs or guns at the [] residence, it [did] not overshadow the other evidence . . . to such an extent that it defeats probable cause"); United States v. Kelley, Criminal No. 08–00327–CG, 2009 WL 2589086, at *3 (S.D. Ala. Aug. 17, 2009) (finding that even assuming "the defendants had made a substantial preliminary showing that the information they cite was intentionally or recklessly omitted, their request for a hearing would still be futile because they cannot meet the second prog of the Franks requirements," since "[i]nclusion of the omitted facts would not have vitiated the court's finding of probable cause"). "Thus, even if the affidavit were revised to include the

omitted [information], that revised affidavit would have established probable cause to search [the motel room]" and seize the items that had been observed in plain view as well as any firearm,[20] United States v. Jones, 942 F.3d 634, 641 (4th Cir. 2019) (citation omitted), and Thomas is not entitled to a Franks hearing. Accordingly, it is **RECOMMENDED** that the motion to suppress evidence obtained during the search of the motel room, [Doc. 23], be **DENIED**.

**2.**   *Motion to Suppress In-Court Identification, [Doc. 73]*

Thomas moves to suppress the out-of-court identification made by Witness 1 on July 1, 2022, as well as any future in-court identification made by Witness 1. [Doc. 73].  In his post-hearing brief, [Doc. 83], Thomas argues that the identification by Witness 1 during the July 1, 2022, show up was unreliable, [id. at 16-17].  The government argues that the show up was not unduly suggestive and Witness 1's on-scene identification of Thomas was reliable, and "[n]othing about the out-of-court identification tainted it to the point that it should be precluded from evidence or that an in-court identification by Witness 1 should be barred."  [Doc. 81 at 25-28].

---

[20] This is particularly true given the fact that the entire room was not searched after the protective sweep and the firearm was not even located during the execution of the search warrant but was found a few days later by the housekeeper while cleaning the room.  See (Tr. at 31, 48, 151-52); see also [Doc. 71-6 at 1; Doc. 71-10; Doc. 71-16].

"In the Eleventh Circuit, a two step analysis is used to determine whether the admission of an out-of-court identification violates due process." United States v. Perkins, Criminal Case No. 1:10–CR–97–JEC–LTW, 2011 WL 2294163, at *6 (N.D. Ga. Apr. 21, 2011) (citing United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001)), adopted by 2011 WL 2268055, at *1 (N.D. Ga. June 8, 2011), aff'd, 787 F.3d 1329 (11th Cir. 2015); see also Perry v. New Hampshire, 132 S. Ct. 716, 720, 722 (2012); United States v. Knight, 382 F. App'x 905, 907 (11th Cir. 2010) (per curiam) (unpublished). "First, a court must determine if the original identification procedures were unduly suggestive." Perkins, 2011 WL 2294163, at *6 (citation omitted). "Only if the answer to that question is yes, does the court continue the inquiry into whether, under the totality of the circumstances, the identification was nonetheless reliable[.]" United States v. Maxime, No. 09-20470 CR MARTINEZ, 2010 WL 2635097, at *1 (S.D. Fla. June 9, 2010) (citation and internal marks omitted), adopted by 2010 WL 2635099, at *1 (S.D. Fla. June 30, 2010).

"'[R]eliability is the linchpin in determining the admissibility of identification testimony.'" United States v. Celis-Sosa, Criminal Action File No. 4:10–CR–43–RLV–WEJ, 2011 WL 2149345, at *3 (N.D. Ga. May 11, 2011) (alteration in original) (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)), adopted by 2011 WL 2160758, at *1 (N.D. Ga. May 31, 2011). The test for determining the reliability of identification testimony is whether, when viewed in light of the

totality of the circumstances, it possesses sufficient indicia of reliability.  Manson, 432 U.S. at 114.  The factors considered in the "totality of the circumstances" analysis include: the opportunity to view the perpetrator at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the perpetrator; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. Neil v. Biggers, 409 U.S. 188, 199-200 (1972); see also Manson, 432 U.S. at 114; Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991); United States v. Rodger, No. CR 109-040, 2010 WL 2643268, at *17 (S.D. Ga. Apr. 16, 2010), adopted by 2010 WL 2643267, at *4 (S.D. Ga. June 30, 2010), aff'd, 521 F. App'x 824 (11th Cir. 2013) (per curiam) (unpublished).  Thomas bears the initial burden of proving that the identification procedures were unduly suggestive, and if he is successful, the burden then shifts to the government to prove that the identification was reliable in spite of the suggestive procedures.  United States v. Wade, 388 U.S. 218, 240 n.31 (1967).

Although the July 1, 2022, identification of Thomas by Witness 1 involved a "show up," see (Tr. at 83, 85, 97, 132), and "the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," United States v. Prudente, CRIMINAL ACTION FILE 1:05-CR-324-CAP, 2006 WL 8440223, at *30 (N.D. Ga. July 19, 2006) (alteration, citation,

and internal marks omitted), adopted by 2006 WL 8440220, at *1 (N.D. Ga. Aug. 28, 2006), "immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh," Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (per curiam) (citation omitted), and "the determination of whether a due process violation has occurred depends on a review of the totality of the circumstances," Prudente, 2006 WL 8440223, at *30 (citation omitted).  For the reasons that follow, the Court finds that even if the procedures surrounding the show-up were unduly suggestive, the evidence in the record indicates that Witness 1's identification of Thomas was nonetheless reliable, and therefore, it is not subject to suppression.

First, Witness 1 had sufficient opportunity to view Thomas immediately prior to the shooting, since she was cleaning a nearby room, walked past room 356 several times, and "noticed that the same male [she had seen the day before in room 356 pacing and carrying a black handgun] was [again] pacing around with a gun in front of room 356."  [Doc. 71-6 at 1]; see also [Doc. 24-1 at 2].  Further, she was able to tell that he was a "light-skinned black male[ who was] not wearing a shirt . . . and [was] wearing colored jeans," and that he had "a firearm in his hand when she [saw] him."  (Tr. at 74); see also [Doc. 24-1 at 3; Doc. 71-6 at 2]; United States v. Lewis, Crim. No.: 4:15-cr-00713-RBH-1, 2016 U.S. Dist. LEXIS 193990, at *12-13 (D.S.C. Apr. 11, 2016) (finding that the witness "had a sufficient opportunity

to view the suspect at the time of the crime[] [a]lthough there was a fairly large distance between [ her] and the suspect when the initial shots were fired in the street," since she "was within a few feet of the suspect when he passed her on his way to apartment six," and she had "seen him hanging around apartment six several times before the shooting incident"), aff'd, 719 F. App'x 210 (4th Cir. 2018) (unpublished); United States v. Gloster, Criminal Action No. 5:09CR27-04, 2009 WL 3161232, at *2 (N.D. W. Va. Sept. 29, 2009) (finding sufficient indicia of reliability where witness had the opportunity to view the defendant twice).

Second, Witness 1 paid close attention to Thomas, as she watched him "pacing around with a gun in front of room 356" two days in a row.  [Doc. 71-6 at 1]; see also [Doc. 24-1 at 2]; United States v. Velasquez, No. 2:11–CR–77(12)–PPS–APR, 2013 WL 4048538, at *7 (N.D. Ind. Aug. 8, 2013) (citations omitted) (stating that where "the witnesses are observing the defendant in the commission of a crime—especially one of violence—courts have presumed that their attention is sufficiently drawn to the defendant").  Third, Witness 1 accurately described Thomas before the show-up, as she described "the male as a light-skinned black male, not wearing a shirt . . . and wearing colored jeans," and that he had "a firearm in his hand when she [saw] him."  (Tr. at 74); see also [Doc. 24-1 at 3; Doc. 71-6 at 2]; United States v. Everett, CRIMINAL ACTION FILE NO. 1:17-CR-020-RWS-JKL, 2018 WL 2189763, at *12 (N.D. Ga. Mar. 30, 2018) (citing Rodger, 521 F.

41

App'x at 831 (finding "that show-up was sufficiently reliable where, among other things, eyewitnesses described the robber as wearing a dark-color jacket, skull cap, and sunglasses, and when the defendant was captured, police recovered a blue jacket, skull cap, and sunglasses from his car"), adopted by 2018 WL 2187407, at *1 (N.D. Ga. May 10, 2018); United States v. Owens, CRIMINAL CASE NO. 1:09-CR-0286-RWS-JFK, 2010 WL 11508019, at *8 (N.D. Ga. Mar. 11, 2010) (finding that "[w]hile the description of the first [suspect] by the witnesses was not perfect," including the discrepancy in the age of the suspect, "they provided sufficient general characteristics matching [the suspect's] physical attributes"), adopted by 2010 WL 11520588, at *1 (N.D. Ga. Apr. 7, 2010), aff'd, 445 F. App'x 209 (11th Cir. 2011) (per curiam) (unpublished).

Fourth, Witness 1 demonstrated a high level of certainty that Thomas was the individual she saw holding a gun and pacing around in front of room 356. See (Tr. at 97-98, 132); see also United States v. Blair, CRIMINAL ACTION NO. 1:18-cr-00260-LMM-CMS-1, 2021 WL 3674173, at *5 (N.D. Ga. Aug. 18, 2021) (citation omitted) (reliable identifications where witnesses identified defendant with certainty); United States v. Castro, 243 F. Supp. 2d 565, 572 (W.D. Va. 2003) (footnote and citation omitted) (finding officer's testimony that the witness "never hesitated in his assertion that the photograph [was] of [defendant]" satisfied the fourth reliability factor); United States v. Chavers, CASE NO. 98-8047 CR-

HURLEY, 1999 WL 35794045, at *9 (S.D. Fla. Sept. 22, 1999) (witness was "firm and positive despite her fear of the subjects at the scene"), adopted by 1999 WL 35794044, at *1 (S.D. Fla. Oct. 27, 1999).

Fifth, the identification occurred shortly after the shooting, since she approached the officers when they got to the scene and "told [them] exactly what she saw," (Tr. at 98), so Witness 1's memory was still fresh, see United States v. Lisbon, No. 1:10–CR–251–10–TWT/AJB, 2012 WL 1068618, at *6 (N.D. Ga. Feb. 26, 2012) (citations omitted) (stating that "courts have determined that a period of four months between a witnesses' observation and identification of a suspect is not too lengthy a period of time to render an identification unreliable"), adopted by 2012 WL 1068590, at *1 (N.D. Ga. Mar. 29, 2012).  "Under these circumstances, [Witness 1's] out-of-court identification was not unreliable even if it had been impermissibly suggestive[.]"   Johnson, 817 F.2d at 729; see also Blair, 2021 WL 3674173, at *5 (stating "even if the show-ups were unduly suggestive, it is clear from the totality of the circumstances that [the witnesses'] identifications were reliable"). Accordingly, Thomas' arguments regarding the out of court identification by Witness 1 is without merit, and because he has not identified any legitimate basis

for suppression, it is **RECOMMENDED** that the motion to suppress, [Doc. 73], be

**DENIED**.[21]

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Thomas' motions to

dismiss, [Docs. 22 & 24], and his motions to suppress evidence, [Docs. 23 & 73], be

**DENIED**.

There are no other pending matters before the Magistrate Judge, and the

undersigned is aware of no problems relating to the scheduling of this case.  **IT IS**

**THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is

hereby, certified Ready for Trial.

---

[21] Thomas also moved to suppress statements made on July 1, 2022, "during the illegal search[] and subsequent to his resulting arrest," [Doc. 23 at 2], and at the conclusion of the evidentiary hearing, Thomas' counsel indicated that he was contemplating whether to move to suppress any statements based on the evidence presented at the evidentiary hearing, and he was ordered to brief any statements he sought to suppress, (Tr. at 166-67).  However, Thomas did not address this argument in any subsequent briefing.  See [Docs. 78 & 83].  Accordingly, Thomas is deemed to have abandoned his motion to suppress statements made on July 1, 2022.  United States v. Smith, No. 1:07–cr–54–WSD, 2008 WL 746546, at *7 (N.D. Ga. Mar. 18, 2008) (noting that defendant had abandoned motion to suppress statements where he made no argument with respect to it), adopted at *4.

**IT IS SO ORDERED** and **RECOMMENDED**, this 27th day of February, 2024.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE